# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

TAYR KILAAB AL GHASHIYAH (KHAN)
formerly known as JOHN CASTEEL,
      Plaintiff,

     **v.**                              **Case No. 01-C-10**

WISCONSIN DEPARTMENT OF
CORRECTIONS, JON E. LITSCHER,
DANIEL BERTRAND, MICHAEL BAENEN,
KENNETH MORGAN, CHRISTOPHER ELLERD,
JUDY SMITH, GARY MCCAUGHTRY, and
GENE DOBBERSTEIN,
      Defendants,

## DECISION AND ORDER

## I. BACKGROUND

Plaintiff Tayr Kilaab al Ghashiyah, formerly known as John Casteel, a Wisconsin state prisoner currently incarcerated at the Boscobel Correctional Institution ("BCI"), filed this pro se civil rights action under 42 U.S.C. § 1983 and the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), 42 U.S.C. §2000cc-1(a) et seq.,[1] against the Wisconsin Department of Corrections ("DOC") and several corrections officials in their individual and official capacities. By order of July 30, 2001, I allowed plaintiff to proceed in forma pauperis on claims that defendants violated his rights under the First Amendment's Free Expression and Free Exercise Clauses, the Due Process Clause of the Fourteenth Amendment, RLUIPA and

---

[1]Plaintiff actually sought relief against defendants under the Religious Freedom Restoration Act of 1993 (RFRA). However, I have construed his claims as being brought pursuant to RLUIPA in view of the fact that Congress enacted RLUIPA following the Supreme Court's decision in City of Boerne v. Flores, 521 U.S. 507 (1997), which struck down RFRA insofar as it applied to states and localities.

state law.[2]  Specifically, plaintiff alleged that defendants interfered with his religious liberty, due process rights and/or state law by: (1) refusing to provide him with a diet consistent with his religious beliefs; (2) prohibiting him from using his legal, religious name; and (3) denying him access to religious property.[3]  Plaintiff also alleged that defendants' policies relating to his religious property were discriminatory and in violation of his rights under the First Amendment, the Equal Protection Clause of the Fourteenth Amendment and RLUIPA.[4]

In response to the parties' first cross-motions for summary judgment, I dismissed plaintiff's state law claim and held that his failure to file DOC form 1090 precluded him from seeking injunctive relief with respect to his religious property claims under the First Amendment and RLUIPA.  Thereafter, defendants filed a second motion for summary judgment.  In deciding this motion, I summarized my ruling as follows:

> I dismiss plaintiff's First Amendment and RFRA [RLUIPA] religious dietary claims on the grounds of qualified immunity.  I grant summary judgment for defendants on the merits of plaintiffs' First Amendment and RLUIPA religious name claims. With respect to plaintiff's First and Fourteenth Amendment religious property claims, I conclude that plaintiff properly alleged damages and, therefore, those claims survive.  Further, defendants have not moved for summary judgment on plaintiff's religious property RLUIPA claims, and such claims also survive.

(Court Order of Sept. 29, 2006, at 36 [Docket #218].)[5]  Thus, the following claims survived the

---

[2]Plaintiff's §1983 official capacity claims against the DOC and "the natural person defendants" were dismissed in the July 30, 2001, screening order.

[3]Plaintiff also stated First Amendment and RLUIPA claims based on allegations that he was forced to receive a tuberculosis shot containing pork protein.  However, those claims were ultimately dismissed for failure to exhaust administrative remedies.

[4]While the initial screening order of July 30, 2001, did not explicitly address the equal protection claim, recognized the existence of such a claim in my order of March 22, 2002.

[5]While I concluded that plaintiff had properly alleged damages, I also ruled that plaintiff's damages were limited under 42 U.S.C. § 1997e(e) to punitive and nominal damages.

2

September 29 Order: (1) plaintiff's First and Fourteenth Amendment religious property claims; (2) plaintiff's RLUIPA religious property claims; and (3) his religious diet and religious name claims under the Fourteenth Amendment Equal Protection and Due Process Clauses.

Defendants sought leave to file final motions for summary judgment on the remaining claims, and I granted that request on October 11, 2006. Presently before me are the parties' final cross-motions for summary judgment on the remaining claims. In addition, the following motions are before me: (1) Defendants' Motion for Rule 11 Sanctions; (2) Plaintiff's Motion for Costs Under Rule 54; and (3) Plaintiff's Motion for Sanctions. All pending motions will be addressed herein.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is required "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The mere existence of some factual dispute does not defeat a summary judgment motion; "the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). For a dispute to be genuine, the evidence must be such that a "reasonable jury could return a verdict for the nonmoving party." Id. For the fact to be material, it must relate to a disputed matter that "might affect the outcome of the suit." Id.

The moving party bears the initial burden of demonstrating that it is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Where the moving party seeks summary judgment on the ground that there is an absence of evidence to support the non-moving party's case, the moving party may satisfy its initial burden simply by pointing

3

out the absence of evidence.  Id. at 325.  Once the moving party's initial burden is met, the nonmoving party must "go beyond the pleadings" and designate specific facts to support each element of the cause of action, showing a genuine issue for trial.  Id. at 322-23.  Neither party may rest on mere allegations or denials in the pleadings.  Anderson, 477 U.S. at 248.

In evaluating a motion for summary judgment, the court must draw all inferences in a light most favorable to the nonmoving party.  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  However, it is "not required to draw every conceivable inference from the record — only those inferences that are reasonable."  Bank Leumi Le-Israel, B.M. v. Lee, 928 F.2d 232, 236 (7th Cir. 1991).  In addition, a summary judgment motion cannot be disputed with hearsay statements, Eisenstadt v. Centel Corp., 113 F.3d 738, 742 (7th Cir. 1997), or with "conclusory allegations and self-serving documents, without support in the record," Hall v. Bodine Elec. Co., 276 F.3d 345, 354 (7th Cir. 2002) (citing Patterson v. Chi. Ass'n for Retarded Citizens, 150 F.3d 719, 724 (7th Cir. 1998)).

The fact that both parties have moved for summary judgment, and thus both parties simultaneously are arguing that there is no genuine issue of fact, does not establish that a trial is unnecessary or empower me to enter judgment as I see fit.  See 10A Charles Alan Wright, et al., Federal Practice and Procedure § 2720, at 327-28 (3d ed. 1998).  I may grant summary judgment only if one of the moving parties is entitled to judgment as a matter of law on the basis of the material facts not in dispute.  See Mitchell v. McCarty, 239 F.2d 721, 723 (7th Cir. 1957).

4

## III. DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**A.    Findings of Fact**

Along with their motion, defendants filed a supporting brief and "Proposed Findings of Fact," which were "supported by specific citations to evidentiary materials in the record" as required by Civil Local Rule 56.2(a).    Their submission identified seventy-six factual propositions.[6]  Plaintiff filed an opposing brief and a response to defendants' proposed findings of fact.  However, under the local rules, any proposed finding of fact that is not challenged by plaintiff with a citation to evidentiary material will be deemed undisputed.  See Civ. L.R. 56.2(e) (E.D. Wis.).  In addition, responses that consist solely of hearsay or argument do not create a genuine issue of material fact and must be disregarded.  See Fed. R. Civ. P. 56(e); Eisenstadt, 113 F.3d at 742.

Defendants filed a reply to plaintiff's proffered responses to their proposed findings of fact.  The reply also identified additional findings of fact, which were numbered as ¶¶ 337-369. These additional findings of fact addressed various factual propositions identified by plaintiff in his responses (and supporting affidavits) and in his response brief.

Based on the above, I find the following facts to be undisputed.

**1.    Facts Relating to Plaintiff's Religious Diet Claims**

When the Racine Correctional Institution ("RCI") and Oshkosh Correctional Institution ("OSCI") serve pork, they indicate that pork is in a menu item by placing an asterisk next to the

---

[6]Defendants' proposed findings of fact begin with number 260 because they intend to rely on some of the previous 259 findings of fact submitted with their earlier "Second Motion for Summary Judgment," which I found to be undisputed.

5

item.  (Defs.' Proposed Finding of Fact [DPFOF] ¶¶ 260 and 262.)[7]  It is the policy at RCI and OSCI that whenever pork is served at the institution, a hearty soup or two ounces of peanut butter and two slices of bread are offered so that inmates who do not eat pork will have a healthy alternative.[8]  (DPFOF ¶¶ 261 and 263.)  In 1997, as well as today, all dishes, trays and utensils at RCI and OSCI are sterilized by being washed at the very high temperatures required by state code. (DPFOF ¶ 264; Pl.'s Resp. to Defs.' Proposed Findings of Fact [Pl.'s Resp.] at 2.)[9]

It would be impossible for RCI or OSCI to know which utensils, trays, dishes, pots and pans have ever had contact with pork.  (DPFOF ¶ 265; Pl.'s Resp. at 2.)  It would also be extremely expensive for RCI or OSCI to create and maintain a completely separate system of food preparation and serving to segregate utensils, dishes and pots and pans that were previously used to cook pork from newly purchased utensils, dishes, pots and pans designated "pork-free."  (DPFOF ¶ 266.)  OSCI serves meals to approximately 2050 inmates three times a day.  (DPFOF ¶ 267.)  RCI serves approximately 1575 inmates three times a day.  (DPFOF ¶ 268.)  To maintain separate food preparation systems for pork-free and non-pork-free pots,

---

[7]Plaintiff's contention that in 1984 he was directed to mix barbeque pork into taco meat is irrelevant as the alleged event took place outside the time frame for this lawsuit.

[8]Plaintiff states in his affidavit that OSCI provided "no substitutes" because of this policy. (Fifth Affidavit of Tayr Kilaab Al Ghashiyah, [Fifth Aff. of Ghashiyah] ¶ 39.)  However, the fact that OSCI did not provide a substitute entree does not mean that it did not serve soup or peanut butter in accordance with its own policy.

[9] Plaintiff attempts to call this finding into question by asserting that he was not trained to watch the temperature on the machines when he was in food service, but he fails to indicate when and where he worked in food service.  Further, his contention that inmates do not properly clean the items prior to putting them into the machine is not relevant to the fact that the items are sterilized in the dishwasher in accordance with state codes.

6

pans and utensils, RCI and OSCI would need to renovate their kitchens. (DPFOF ¶ 269.) It would be cost-prohibitive to reconfigure prison kitchens to hold a separate food preparation and serving system to accommodate inmates who desire no contact with pots and utensils that have ever contacted pork. (DPFOF ¶ 270.) Further, it may pose security problems if RCI or OSCI were to separate the serving lines and allow inmates to congregate by stated dietary preference.[10] (DPFOF ¶ 271.)

Kosher meals were not provided to inmates at OSCI or RCI prior to 2003. (DPFOF ¶¶ 272 and 273.) RCI and OSCI obtain their kosher diet main entrées from a company called My Own Meals, Inc. (DPFOF ¶ 275.) The cost of a My Own Meals kosher entrée varies between $2.27 to $2.94, and this cost does not include other food items like vegetables, crackers, potatoes and fruit, which are provided by the institution's food service. (DPFOF 276.) My Own Meals, Inc. also provides halal meals. (DPFOF ¶ 277.) The halal meal choices at My Own Meals, Inc. are all vegetarian. (DPFOF ¶ 278.) The cost of the halal meals from My Own Meals, Inc. are approximately the same cost as the kosher meals. (DPFOF ¶ 279.) Since My Own Meals, Inc. provides only meatless halal meals, RCI and OSCI chose to accommodate inmates requesting halal foods by allowing them to choose vegetarian meals or self-select appropriate foods off the main menu.[11] (DPFOF ¶ 280.)

---

[10]Plaintiff responds to this proposed finding by stating that RCI and OSCI serve medical diets to incarcerated persons in their cells, which does not cause a security problem. However, serving certain diets to inmates in their cells does not sufficiently contradict the testimony that separate serving lines allowing inmates to congregate by their stated dietary preferences may pose security concerns.

[11]Plaintiff avers that "it is unlawful (Haram) to restrict Muslim to a vegan diet contrary to Islamic law." However, I previously recognized as undisputed that "[t]here is no tenet of Islam that requires Muslims to eat meat; therefore, one could be a vegetarian Mulsim without violating any Tenet of Islam." (Court Order of Sept. 29, 2006, at 9.) Further, the only support for his

7

Having in-house vegetarian choices provides inmates with more food options than they would get through the vendor.  (DPFOF ¶ 281.)  Since My Own Meals, Inc. had only meatless halal meal choices, it would provide nothing that RCI or OSCI cannot or do not provide. (DPFOF ¶ 282.)  It is also more economical to have inmates choose food from the RCI or OSCI menu because it costs approximately $1.34 to $2.01 less, or between 59 and 68 percent less to serve vegetarian entrees prepared at RCI than it does to order them from an outside vendor. (DPFOF ¶ 283.)

> ## 2.    Facts Related To Plaintiff's Name Claim

In my decision and order of September 29, 2006, I ruled that plaintiff exhausted only three claims pertaining to use of his religious name: (1) that defendant McCaughtry allegedly violated plaintiff's rights with respect to his religious name when he dismissed an inmate complaint alleging that plaintiff received mail after his legal name was crossed off it (WCI-1991-691); (2) that defendant McCaughtry allegedly violated plaintiff's rights when he dismissed an inmate complaint that legal documents addressed to "Tayr Kilaab al Ghashiya" had been returned to sender (WCI-1991-2352); and (3) that defendant Bertrand allegedly violated plaintiff's rights with respect to the use of his religious name when he dismissed an inmate complaint alleging that a sergeant had not forwarded mail with the name "Tayr Kilaab/Casteel" on it (GBCI-1995-038).  (Docket #218 at 15.)  I then granted defendants summary judgment on the 1991 complaints pertaining to McCaughtry.

With respect to GBCI-1995-038, the Inmate Complaint Investigator ("ICI") made the following statement in her Summary of Facts:

---

contention is a copy of an unsigned affidavit submitted by a witness in a case filed in a federal court in Minnesota (Fifth Aff. of Ghashiyah ¶ 15 Ex. 3), and inadmissible hearsay (Id. at ¶ 12).

8

> DOC Records Office Procedures indicate that: The name is changed on the records ONLY when the judgment of conviction is amended to reflect the name change, or the court order changing the legal name indicates the change includes ALL RECORDS. Neither of these conditions have been met by inmate Casteel, thus his name has not been changed on institution records.

(DPFOF ¶ 284.) The ICI for GBCI-1995-038 also stated:

> DOC 303 prohibits inmates from using a name other than the name by which he or she was committed to the department, therefore the mail room appropriately rejects outgoing mail bearing a different name.

(DPFOF ¶ 285.) In addition, the ICI for GBCI-1995-038 stated:

> Although mail room personnel MAY recognize an inmate by an alias or a religious name, they will not set a precedent of delivering mail that is improperly addressed to a name not carried on the (GBCI) Active Offender roster. With 850+ inmates, and as many aliases, this would just not be feasible.

(DPFOF ¶ 286.) Warden Bertrand's designee dismissed GBCI-1995-038. (DPFOF ¶ 287.)

### 3. Facts Relating To Religious Property Claims

#### a. Exhaustion of Administrative Remedies

Between January 5, 1990, and January 5, 2001, plaintiff filed six inmate complaints about religious property. (DPFOF ¶¶ 289 and 337.) These six complaints were designated WCI-1990-600, GBCI-1996-0400, OSCI-1996-2483, OSCI-1996-2769, RCI-1998-0177 and RCI-2000-4557. (DPFOF ¶¶ 290 and 337.)

On March 16, 1990, plaintiff filed complaint WCI-1990-0600, in which he complained that his prayer rug was improperly confiscated as contraband. (DPFOF ¶ 291.) Plaintiff had purchased the prayer rug in question from another inmate for $15. (DPFOF ¶ 292.) The ICI's Summary of Facts states that plaintiff purchased the prayer rug from another inmate in 1987, and Friar Campion Prendergast had approved his possessing it. (DPFOF ¶ 293.) The ICI reported:

9

> According to Lt. Loomans, the prayer rug was made as a hobby project by an inmate and then sold to the complainant. WCI Hobby Rules & Procedures state that all completed hobby projects must be sent out of the institution. The Hobby rules do state that an inmate may purchase a completed hobby project from another inmate, however, it cannot be bought with the intention of becoming a part of an inmate's personal property.
>
> However, the prayer rug was legitimately purchased and approved by a staff member going through proper channels with notification to Security. Because proper notification was given to Security and no action was taken at that time (when the rules were the same as now), it is unreasonable to now declare the rug contraband.

(DPFOF ¶ 294.) The ICI recommended that WCI-1990-0600 be affirmed, and that the prayer rug either be allowed or plaintiff reimbursed $15 for it. (DPFOF ¶ 295.) Warden McCaughtry accepted the ICI's recommendation. (DPFOF ¶ 296.) Plaintiff was reimbursed $15 for the prayer rug. (DPFOF ¶ 297.) Plaintiff appealed the affirmation of WCI-1990-0600. (DPFOF ¶ 298.) The Corrections Complaint Examiner ("CCE") recommended WCI-1990-0600 be dismissed as resolved, and DOC Secretary Sullivan accepted the CCE's decision as his own. (DPFOF ¶ 299.)

On March 25, 1996, plaintiff filed complaint GBCI-1996-0400, in which he expressed his concern that his forthcoming religious jewelry may be withheld by mail room staff in violation of Sasnett v. Sullivan, W.D. Wis. Case No. 94-C-52-C. (DPFOF ¶ 300.) Inmate complaint GBCI-1996-0400 also asserted that Muslim inmates should be allowed prayer oil "because it is a sincere religious motivation dictated by the Holy Quran and practice by the complainant and other Muslims." (DPFOF ¶ 301.) The Institution Compliant Examiner ("ICE")'s report for GBCI-1996-0400 states:

> The DOC/DAI is working on appropriate procedures for implementing the order of the Court in the *Sassnett* [sic] case. Warden Bertrand has advised inmate Casteel that his jewelry will be held until these implementation procedures are established. It is anticipated that this will happen on May 15, 1996. At that time a determination will be made as to the appropriateness of the jewelry.

10

(DPFOF ¶ 302.) Warden Bertrand dismissed GBCI-1996-0400, and plaintiff did not appeal the dismissal to the CCE. (DPFOF ¶ 303.)

On September 22, 1996, plaintiff filed complaint OSCI-1996-2483, in which he complained that the Chaplain was denying him prayer oil in violation of his constitutional rights. (DPFOF ¶ 304). The ICE's report states:

> I spoke with Chaplain Poff. He stated that he is not aware of you ever bringing this matter to his attention. There is not a total ban on the use of prayer oils at OSCI. Prayer oil is available from the Chaplain for use during Muslim prayer service. However, prayer oil is not allowed in inmate's personal possession, nor may it be taken back to living Centers. Based on this information, no further action is recommended.

(DPFOF ¶ 305.) Warden Smith dismissed OSCI-1996-2483 for the reasons set forth by the ICE. (DPFOF ¶ 306.) Plaintiff appealed the dismissal, accusing the Chaplain of having lied about providing prayer oil. (DPFOF ¶ 307.) Plaintiff's appeal asserted that Muslims pray five times per day and are required to bathe and use oils before each prayer session, "and there was no one at his office to provide the oils" when plaintiff came by the Chaplain's office prior to his afternoon prayers. (DPFOF ¶ 308.) The CCE recommended that OSCI-1996-2483 be dismissed, explaining:

> DOC 309 IMP 6-G states only that inmates may possess the following: Quran, prayer beads, prayer rug and head covering, in addition to other literature, it does not state oils are allowed. OSCI P&P 715.5A regarding religious practices also does not address this issue. OSCI is currently in the process of rewriting this P&P to address this issue. Per Chaplain Poff the Muslim group has a fund, this group – through the Chaplain – purchases the oils for use in their religious services. The oils are kept with the Chaplain not the inmates and used during services only. It is apparent that Mr. Casteel is not being denied his religious freedom and that OSCI is working on a policy to clearly spell this out.

(DPFOF ¶ 309.) The Secretary's Designee, Ave Bie, accepted the CCE's recommendation as the decision of the Secretary. (DPFOF ¶ 310.)

11

On October 17, 1996, plaintiff filed complaint OSCI-1996-2769, in which he complained that an Officer Wagoner had informed him and another inmate that they could not wear their religious medals because doing so was against policy and procedures, despite a December 4, 1995, Western District of Wisconsin decision providing that inmates may wear such medals. (DPFOF ¶ 311.)  The ICE's report states:

> I contacted Officer Wagoner and he stated that at no time did he say that you could not wear the religious emblems in question.  He simply questioned your wearing of the medals because he was unclear of the rule involved.  Officer Wagoner is now aware of the above referenced Internal Management Procedure [IMP #6-K] and as long as you are in compliance with this IMP you will have no further problems.  Based on this information, no further action is recommended.

(DPFOF ¶ 312.)  Warden Smith dismissed OSCI-1996-2769.  (DPFOF ¶ 313.)  Plaintiff appealed the dismissal of OSCI-1996-2769, asserting that the ICE was just covering up for Officer Wagoner's ignorance or negligence, and asserting that it is inexcusable for a correctional officer to claim he is unaware of a court decision that appeared in the newspapers almost a year earlier.  (DPFOF ¶ 314.)  The CCE's recommendation to dismiss complaint OSCI-1996-2769 was accepted as the decision of the Secretary.  (DPFOF ¶ 315.)

On January 22, 1998, plaintiff filed complaint RCI-1998-0177, in  which he alleged:

> When the complainant first arrived at [Racine Correctional Facility], he visited the so-called Rev. and informed the Rev. of the mandatory injunction of his Islamic beliefs on the usage of prayer oils.  In fact, the complainant provided the Rev. with two documents from Waupun and Resource Center which allowed him to use his oils.

(DPFOF ¶ 316.)[12]  The ICE's report for RCI-1998-0177 states:

> Under the Internal Management Procedure mentioned above [IMP 6-G], the use

---

[12]Defendants' Proposed Findings of Fact states that RCI-1998-0177 was filed on January 12, 1997.  (DPFOF ¶ 316.)  However, the affidavit of John Ray reveals that such inmate complaint was actually filed with the ICE on January 22, 1998.   (Ray Aff. ¶ 3.)

12

of prayer oils is not a minimum required practice for one to participate in the Muslim Religion. It was decided by Chaplain Thomas that the prayer oils will not be allowed. They have not been used by anyone since the institution was opened and there have been no problems created from this. I/M Casteel is allowed to practice the Muslim Religion and is allowed the minimum required obligations to effectively practice his religion. Prayer oils is not a minimum required obligation.

(DPFOF ¶ 317.) Warden Morgan accepted the ICE's recommendation and dismissed RCI-1998-0177 on March 6, 1998. (DPFOF ¶ 318.) By letter dated April 26, 1998, and received April 28, 1998, plaintiff sent DOC Secretary Sullivan a copy of his appeal of inmate complaint RCI-0177-98 (RCI-1998-0177), and asked Secretary Sullivan to forward it to the CCE for review. (DPFOF ¶ 319.) The CCE recommended dismissal of plaintiff's appeal of RCI-1998-0177 because it had not been filed within ten calendar days of the Warden's decision, as required by Wis. Admin. Code § DOC 310.13(1). (DPFOF ¶ 320.) The Secretary's designee, Ave M. Bie, accepted the CCE's recommendation as the decision of the Secretary. (DPFOF ¶ 312.)

On February 11, 2000, plaintiff filed Offender Complaint RCI-2000-4557. (DPFOF ¶ 337.) RCI-2000-4557 states:

> Since Prison officials at the Racine Prison Facility prohibition on incarcerated persons within Seg units access to spiritual practices, such as attending Friday Prayer at Chapel, Mass, Sweat Lodge and Pipe Ceremony; the complainant challenges the policy or lack of policy to provide incarcerated persons in Seg units access to certain tenets and ceremony at the individual's cell pursuant to DOC 303.70(7).
> ...
> The complainant seek to participate in several types of ceremony and ritual at his cell pursuant to DOC 303.70(7) which consist of burning incenses charcouls – or sage, wearing of talismans, application of oils, burning of candles, wand and the smoking of sacrament, such as shaman smoke.
> The complainant suggest that the pipe used to smoke shaman smoke and other items can be passed through the food port in the door and returned to the jailor bubble afterward . . .

13

(DPFOF ¶ 338.)  The ICE's Report for RCI-2000-4557 states:

> Inmate Casteel complains that segregation inmates are not allowed to access religious practices such as Friday prayer, sweatlodge, pipe ceremony, etc., in violation of DOC 303.70(1) and requests that he be allowed to burn incense or sage, apply oils, burn candles and smoke Shaman smoke in his cell, pursuant to the above-referenced code number.
>
> Policy and Procedure 717.5(II)(B) states that the chaplain will visit the segregation unit on a weekly basis to offer and provide counseling.  Under IV (A)(Chapel rules), it states, "inmates in segregation status will not be permitted to attend regular religious chapel services." DOC 309.61(b) states, "inmates may pursue lawful religious practices required or encouraged by their respective religions which are consistent with their orderly confinement, the security of the institution and fiscal limitations."  Inmate Casteel is in segregation confinement, and the security of the institution could be compromised if staff were letting inmates smoke in their cells (which violates institution rules and policy), burn incense, etc., not to mention the potential fire hazard as the inmate is locked into the cell.  Inmate Casteel quotes DOC 303.70(7) which states, "program and recreation opportunities shall be provided as possible but must be provided at the individual's cell, unless otherwise authorized by the security director."  The inmate may receive spiritual counseling at his cell.  He simply needs to forward an interview request to see the chaplain for spiritual counseling. The inmate's interpretation is incorrect.
>
> Recommendation to dismiss complaint.  Inmates in segregation are not allowed to attend regular chapel services, nor will the service be brought to the inmate's cell door. Inmates are not permitted to smoke sage, burn incense, anoint themselves with oils, etc., as it could threaten the safety or security of the unit, staff, other inmates, or the inmate himself.

(DPFOF ¶ 339.)  Inmate Complaint RCI-2000-4557 was not directed at any named prison official.  (DPFOF ¶ 340.)  Warden Morgan accepted the ICI's recommendation and dismissed RCI-2000-4557.  (DPFOF 341.)  Plaintiff appealed the dismissal of RCI-2000-4557 (DPFOF ¶ 342), stating:

> It [is] apparent that P & P 717.5(II)(B) is not follow[ed] because the so-called Christian chapel does not make a weekly round to counsel individuals. As the court decisions cited in his complaint stated that dire speculation by prison officials can not stand against guaranteed constitutional rights. The investigator merely indicates that the security could be compromised, however, there is no evidence of a security risk.
>
> The investigators alleges that "inmate may receive counseling at his cell." And the court decision cited in his complaint, stated if a spirit advisor can come

14

to cell, then there no reasons that incarcerated persons could not participate in pipe ceremony or other religious activities thru the food port.

Another Constitutional claim brought to ICI system and ICI investigators thumbed their nose at valid Constitutional rights.

(DPFOF ¶ 343.)

### b. Policies Regarding Religious Property

In setting policy regarding inmate property, DOC sought to minimize pressures and stresses on state correctional institutions and staff from a security, administrative and financial standpoint. (DPFOF ¶ 322.) In 1997 and today, inmates were and are permitted to possess approved religious property associated with their designated religious preference. (DPFOF ¶ 323.) In 1997 and today, under DOC IMP #6A, a Muslim inmate may possess religious books and publications, prayer beads, a prayer rug and a kufi-cap. (DPFOF ¶ 324.) Prayer oils were not an approved religious property item for Muslim inmates in 1997 and, thus, may not have been personally possessed as Muslim personal property in 1997. (DPFOF ¶ 325.)

In setting policy on religious property, DOC considered that there are potentially innumerable "religious" property items and variations of currently approved religious property items, especially given the hundreds of different religions practiced by Wisconsin inmates. (DPFOF ¶ 326.) Given the significant increase in the number of inmate transfers in the system, the trend over the years in regards to inmate property has been to restrict the number of personal property items; to place limits on the total amount of inmate property allowed; to go to sole or limited source(s) vendors; and to make property items more uniform. (DPFOF ¶ 327.) Such limitations enhance security, streamline management and conserve resources. (Id.)

The involvement of the DOC in the management of inmate property and the allocation

15

of staff time and resources to property management must be understood in the context of property management. (DPFOF ¶ 328.) There are seventeen steps that must be completed for the acquisition of every piece of inmate property. (DPFOF ¶ 329.)

It is necessary in a prison setting to control, search and monitor inmate property on a regular basis for a variety of reasons, including to control theft; monitor for misuse of property such as making weapons; prevent bartering; prevent property from being utilized to signify gang affiliation or to hide contraband; and to prevent unauthorized transfer of property, which could be the result of strong-arming, gambling or other debts.[13] (DPFOF ¶ 330.) The security need to regularly search inmate cells is fundamental in a prison, and the more property inmates are allowed, the more problematic and time-consuming these searches become. (DPFOF ¶ 331.)

The need to control the amount of property is also related to health and safety concerns including the potential for fire hazards and roommate relations if cells become overcrowded given the significant amount of double-celling that is occurring due to prison overcrowding. (DPFOF ¶ 332.) These concerns (preventing misuse of property, ensuring security and promoting safety) were all considered when the DOC set its property limits. (DPFOF ¶ 333.) The DOC also considered the need to treat different religious groups fairly by allocating similar amounts of religious property to each faith group, knowing that some faiths use very few property items in their practice while others use many items. (DPFOF ¶ 334; Smith Aff., ¶ 29.)

---

[13]Plaintiff's objection that DPFOF ¶¶ 330-334 are conclusory, argumentative and amount to conclusions of law is without merit. The affidavit of Warden Smith demonstrates that her statements are based upon her personal knowledge and expertise. See Bell v. Wolfish, 441 U.S. 520, 547-48 (1979) (stating that courts generally should defer to the expertise of corrections officials on matters of institutional security).

16

### c. General Facts Relating to Religious Property Items

The use of candles, incense and oil is not required as a part of Islamic prayer or worship.[14] (DPFOF ¶ 335.) There is nothing in the Qur'an that requires, recommends or suggests the use of prayer oils during Islamic prayer or worship; there is no such thing as "Islamic Prayer Oil."[15] (DPFOF ¶ 336.)

There is nothing in the Qur'an that requires, recommends or suggests the use of candles during Islamic prayer or worship. (DPFOF ¶ 344.) In fact, the use of candles during prayer or to create or perform a religious ritual would be un-Islamic. (DPFOF ¶ 345.) Chaplain Beyah, a scholar of Islam, knows of no Islamic sect in which the use of candles plays a role in prayer or worship. (DPFOF ¶ 346.)

There is nothing in the Qur'an that requires, recommends or suggests the use of incense during prayer or worship. (DPFOF ¶ 347.) While a Muslim may permissibly burn incense to make a pleasant fragrance in his or her home, there is nothing in the Islamic religion to require or recommend the burning of incense. (DPFOF ¶ 348.) Chaplain Beyah, a scholar of Islam, knows of no Islamic sect in which the burning of incense plays a role in prayer or worship. (DPFOF ¶ 349.)

There is nothing in the Qur'an that requires, recommends or suggests the use of any

---

[14]Plaintiff attempts to rebut defendants' assertion by pointing to a reference to "The Perfume of the Letter" in Da'Wah – the "science of exorcism" and Hindu-based exorcism. (Fifth Aff. of Ghashiyah Ex. 13.) This reference does not adequately rebut defendants' proposed finding because it does not relate to Islamic prayer or worship nor does it show that "The Letter of the Perfume" means prayer oil.

[15]The documents that plaintiff refers to in an attempt to dispute this factual assertion are either inadmissible hearsay or relate to matters other than prayer oil. At best, plaintiff has shown that he himself has used prayer oil during his prayers.

17

sort of smoke sacrament during prayer or worship. (DPFOF ¶ 350.) Chaplain Beyah knows of no Islamic sect in which the use of a smoke sacrament plays a role in prayer or worship. (DPFOF ¶ 351.) There is no requirement in Islam that Muslims wear any jewelry or talisman. (DPFOF ¶ 352.) In fact, the use of any sort of talisman in Islam is strictly forbidden as idolatrous. (DPFOF 353.) Chaplain Beyah knows of no Islamic sect that uses talismans in prayer or worship. (DPFOF 354.)

Smoking is not allowed in any cells at RCI. (DPFOF ¶ 355.) Smoking has not been allowed indoors at RCI since May 1996. (DPFOF ¶ 356.) Safety, security and institutional order could be compromised if inmates in disciplinary segregation were allowed to smoke or burn things in their cells when others were not. This is because a policy allowing more privileges in segregation could motivate inmates to violate institutional rules in order to be placed in segregation so that they could receive those additional privileges. (DPFOF ¶ 357.) Allowing more property in segregation than in general population would also compromise the prison's rehabilitation goals. (DPFOF ¶ 358.) Property is limited in segregation, in part to motivate inmates to behave so that they want to return to the general population where they can have more property. (DPFOF ¶ 359.) Limited property in segregation helps motivate inmates in general population to behave so that they may stay in general population. (DPFOF ¶ 360.) Finally, limiting property in segregation also facilitates cell searches and transfers, which occur frequently in the segregation unit. (DPFOF ¶ 361.)

Muslims in segregation may possess religious books, a prayer rug and a kufi-cap. (DPFOF ¶ 362.) "Talismans" could be anything: they could be weapons, or they could be used to hide weapons or other contraband. (DPFOF ¶ 363.) Additional property such as unidentified "talismans" is not allowed in the segregation unit. (DPFOF ¶ 364.)

18

RCI's restrictions on incendiary materials are based on safety; smoking and burning pose potential fire hazards, jeopardizing the safety of inmates locked in their cells who are unable to flee on their own. (DPFOF ¶ 365.) The burning of incense, smoking sacrament such as sage, and to a lesser extent candles, causes smoke to enter the air; this smoke would not stay in a particular prison cell but would travel to the hall and other cells, where it could be inhaled by others, threatening their safety by exposing them to chemicals and particulate matter, which may exacerbate serious medical conditions such as asthma, bronchitis or emphysema. (DPFOF ¶ 366.) Smoking sacrament (as well as incense and scented oils) may also be used to mask the odors of unlawful activities, such as the smoking of marijuana. (DPFOF ¶ 367.)

Cell extractions are a relatively common occurrence in the RCI segregation unit, and they depend on quick action by staff. (DPFOF ¶ 368.) It would be difficult for staff to quickly and safely contain an inmate and escort him from his cell against his will, and it would thus pose a threat to staff and inmate safety, as well as institutional security, if inmates were allowed to anoint their bodies with oil. (DPFOF ¶ 369.)

**B.     Analysis of Defendants' Summary Judgment Motion**

**1.     Exhaustion**

The Prison Litigation Reform Act ("PLRA") provides in pertinent part that

> [n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a). Exhaustion of administrative remedies is a condition precedent to suit. Dixon v. Page, 291 F.3d 485, 488 (7th Cir. 2002). Failure to exhaust is an affirmative defense,

19

which defendants have the burden of pleading and proving.  <u>Dale v. Lappin</u>, 376 F.3d 652, 655 (7th Cir. 2004).

Plaintiff argues that his claims should not be limited by the administrative exhaustion requirement of the PLRA.  He maintains that this requirement should not be retroactively applied to claims that arose before the effective date of the PLRA amendments – April 26, 1996.  I previously rejected this argument in my order of September 29, 2006, noting that the exhaustion requirement of the PLRA applied to suits, like plaintiff's, which were filed after the effective date of the amendment regardless of when the claims arose.  <u>See</u> <u>McCoy v. Gilbert</u>, 270 F.3d 503, 510 (7th Cir. 2001).  However, the Seventh Circuit has recognized that where

> the complained of event transpired before the enactment of the PLRA, a prisoner can show exhaustion by demonstrating that he substantially complied with the institution's grievance policy.  The prisoner must have clearly given the institution notice of his particular demands and reasonably triggered an attempt to resolve them.

<u>Id.</u> at 512 (citing <u>Smith v. Zachary</u>, 255 F.3d 446 452 (7th Cir. 2001)).  Plaintiff's arguments that he substantially complied with the institution's grievance policy all fail, but will be addressed in the context of each particular grievance.

Plaintiff also argues that the exhaustion requirement is not generally applicable to his case because he is seeking only monetary damages.  This argument is without merit.  When plaintiff first filed this action, his request for relief was not limited to damages as he also sought injunctive relief.  More significantly, the PLRA's exhaustion requirement applies regardless of the relief plaintiff seeks.  <u>Booth v. Churner</u>, 532 U.S. 731, 741 (2001).

Lastly, plaintiff argues that <u>Wooley v. Maynard</u>, 430 U.S. 705 (1977) supports his contention that he was not obligated to exhaust his administrative remedies prior to bringing suit.  However, <u>Wooley</u> is distinguishable from plaintiff's case.  In <u>Wooley</u>, the plaintiff, a

20

resident of New Hampshire, brought an action for declaratory and injunctive relief under 42 U.S.C. § 1983 against future enforcement of a state statute making it a crime to obscure the words "Live Free or Die" on state license plates.  Plaintiff, George Maynard, had served time and paid a fine for previous violations of the law.  The question before the Court was whether a federal court should abstain from exercising jurisdiction under principles of equitable restraint in accordance with Younger v. Harris, 401 U.S. 37 (1971), which seeks to avoid federal interference in ongoing state prosecutions.  Wooley, 430 U.S. at 709-710.  The Court held that it could hear the case even though the plaintiff had failed to seek review of his criminal convictions before he sought relief in federal court.  Id. at 711. This was so, according to the Court, because the plaintiff's suit was not intended to annul the results of the state trials, but was instead "wholly prospective" by seeking to prevent future enforcement of the criminal statute.  Id. at 710-11.

The Wooley case is not germane to the issues presently before me, because plaintiff in this case does not seek prospective relief.  Plaintiff is seeking monetary damages due to defendants' past actions.  Accordingly, plaintiff's diet and name claims are limited to those found to have been exhausted in my September 29, 2006, decision and order.  Plaintiff's claims pertaining to his religious property are also limited to those he has administratively exhausted, as set forth later in this order.

### 2.    Religious Diet Claims

Plaintiff alleged in his complaint that defendants violated his religious dietary needs by providing him with food prepared with cooking utensils that had previous contact with pork and by failing to provide him with meat from animals that were killed by someone invoking the name of Allah.  (Compl. ¶ 6.)  I subsequently construed these allegations as claims under the Free

21

Exercise Clause of the First Amendment and RLUIPA and as a claim that defendants' policies regarding food violated his right to equal protection under the Fourteenth Amendment.

Plaintiff's First Amendment and RLUIPA claims have been dismissed. That leaves plaintiff's religious dietary claim under the Equal Protection Clause. However, because of my earlier rulings, that claim has been limited in three ways: (1) plaintiff's claim for injunctive relief regarding his religious diet is moot (Docket #218 at 35); (2) plaintiff is entitled to recover punitive and nominal damages only relating to such claim (Docket #218 at 21-23); and (3) plaintiff's religious diet claim is limited to those claims raised in inmate complaints OSCI-1997-2131 and RCI-1997-3797, as those were the only two claims that plaintiff administratively exhausted (Docket #218 at 20). Thus, the two viable religious dietary claims are the following: (1) that Warden Smith violated plaintiff's rights when she dismissed an inmate complaint about OSCI not providing "kosher" meats and kitchenware; and (2) that Warden Morgan violated plaintiff's rights with respect to his diet when he dismissed an inmate complaint asking that RCI discontinue serving pork and begin maintaining halal kitchenware. (Docket #218 at 15-16.)

Plaintiff attempts to argue his unexhausted grievances pre-dating the passage of the PLRA by claiming that he substantially complied with the institution's grievance procedure. However, in my September 29th decision, I also ruled that plaintiff had not presented any evidence to support invocation of this exception. These rulings constitute the law of the case and will be adhered to in resolving the instant motion for summary judgment. See Alston v. King, 157 F.3d 1113, 1116 (7th Cir. 1998) (stating that the law of the case doctrine establishes a presumption that a ruling made at one stage of the proceedings will be adhered to throughout the suit).

Turning to the merits of plaintiff's equal protection claim, plaintiff contends that Wardens

Smith and Morgan discriminated against him when they dismissed inmate complaints asking that OSCI and RCI cease serving pork, start providing halal meat and refrain from preparing food with pots and utensils that had previously been used to cook pork.[16]  Defendants argue that they are entitled to summary judgment because plaintiff cannot prevail on the merits of an equal protection claim whether such claim is viewed as one that he was discriminated against as a Muslim or as a "class of one."

The purpose of the Equal Protection Clause of the Fourteenth Amendment is to "secure every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents."  Village of Willowbrook v. Olech, 528 U.S. 562, 564 (2000) (citing Sioux City Bridge Co. v. Dakota County, Neb., 260 U.S. 441 (1923)).  To comply with equal protection, governmental entities are generally required to treat all similarly-situated persons in a similar manner.  City of Cleburne v. Cleburne Living Center, 473 U.S. 432, 439 (1985).  "To state an equal protection claim, a § 1983 plaintiff must allege that a state actor purposefully discriminated against him because of his identification with a particular (presumably historically disadvantaged) group."  Sherwin Manor Nursing Center, Inc. v. McAuliffe, 37 F.3d 1216, 1220 (7th Cir. 1994).

Prisoners do not constitute a suspect class entitled to strict scrutiny of regulations or

---

[16]In his brief, plaintiff attempts to expand his religious diet claim to include defendants Litscher, Baenen and Bertrand.  However, I ruled in my decision of September 29, 2006, that defendants were entitled to summary judgment with respect to all religious diet claims other than those raised against Smith and Morgan in OSCI-1997-2131 and RCI-1997-3797, respectively.  (Docket #218 at 20.)  Moreover, it is undisputed that neither Litscher, Baenen nor Bertrand had any personal involvement with the food service policies at issue in OSCI-1997-2131 and RCI-1997-3797.

programs affecting them.  <u>Pryor v. Brennan</u>, 914 F.2d 921, 923 (7th Cir. 1990).  Where the circumstances do not involve a suspect classification such as race or gender, an inmate who challenges a particular prison practice or regulation must show or indicate that the regulation is not reasonably related to a legitimate governmental concern, or must demonstrate that the challenged regulation or practice is an exaggerated response to those concerns.  <u>See</u> <u>Turner v. Safley</u>, 482 U.S. 78 (1987); <u>Caldwell v. Miller</u>, 790 F.2d 589 (7th Cir.1986).

Denying a privilege to adherents of one religion while granting it to others may constitute discrimination on the basis of religion in violation of the Equal Protection Clause.  <u>Lindell v. Casperson</u>, 360 F. Supp. 2d 932, 958 (W.D. Wis. 2005), <u>aff'd</u>, 169 Fed. Appx. 999 (7th Cir.), <u>cert. denied</u>, 127 S. Ct. 183 (2006).  However, not every religious sect or group within a prison – however few in number – must have identical facilities or personnel.  <u>Id.</u>  Even if a prison regulation treats inmates unequally, the regulation will be upheld if it is reasonable in light of legitimate penological interests.  <u>May v. Sheahan</u>, 226 F.3d 876, 882 (7th Cir. 2000).

Plaintiff has not shown that the decisions of Wardens Smith and Morgan to dismiss his inmate complaints asking that OSCI and RCI cease serving pork, start providing halal meat and refrain from preparing food with pots and utensils that had previously been used to cook pork were made because plaintiff was a Muslim.  Indeed, the undisputed facts reveal that plaintiff's Muslim faith does not require him to eat meat nor does it prohibit him from eating food prepared with kitchenware that has been in contact with pork.[17]  (Docket #218 at 8-9.) Furthermore, plaintiff has failed to present evidence showing that defendants Smith and

---

[17]I ruled in my September 29, 2006, decision that these facts were undisputed.  Plaintiff's attempts to call these facts into question are untimely and inadequate as the documents he relies on are inadmissible hearsay.  <u>See</u> Fed. R. Civ. P. 56(e); <u>Ford v. Wilson</u>, 90 F.3d 245, 246 (7th Cir. 1996).

24

Morgan treated Muslims unequally. To support his unequal treatment claim, plaintiff argued that Jewish inmates were provided kosher meals, but Muslims were not provided halal meat. The problem with his argument is that the evidence shows that kosher meals were not served to Jewish inmates by OSCI or RCI in 1997, which is the relevant time period for purposes of his religious diet claims.[18] (DPFOF ¶ 272-273.) Plaintiff also maintains that the DOC allowed special religious diets such as fish on every Friday for Catholics. However, he has presented no competent evidence to substantiate this assertion.

Even if plaintiff had successfully shown that defendants discriminated against him because of his religion, the undisputed evidence establishes that defendants' refusal to honor his religious diet requests was reasonably related to a legitimate governmental concern. Defendants provide evidence establishing that their decisions to deny plaintiff's dietary requests were based on economic and social order concerns, which are valid penological interests. Al-Alamin v. Gramley, 926 F.2d 680, 687 (7th Cir. 1991). It is undisputed that when making dietary choices, a Muslim could self-select from the general menu or select the vegan/vegetarian diet that was already offered at the relevant institutions. The undisputed facts demonstrate that accommodating plaintiff's demands for halal meat, separate utensils and separate food preparation systems would be cost-prohibitive. (DPFOF ¶ ¶ 122; 266-270; 281-283.) In addition, defendants provide evidence of security concerns with creating separate serving lines, which would allow inmates to congregate based on their stated diet preference. (DPFOF ¶ 271.)

Plaintiff argues in his affidavit that the DOC has maintained "a separate food preparation

---

[18]OSCI and RCI began offering kosher entrees from an outside vendor in 2003. (DPFOF ¶ 272-273.)

system for over twenty (20) years including making up medical diet orders." (Pl.'s Resp. Br. at 9, citing Fifth Aff. of Tayr Kilaab, ¶¶ 17, 18, 20, 22.) However, plaintiff is not competent to testify as to DOC policy nor is his assertion supported by any evidence.[19] Moreover, the fact that separate medical diets are prepared for inmates does not mean that entirely separate food preparation systems are in place for those types of diets or that OSCI or RCI used separate vendors or incurred additional costs in furnishing those diets.

In sum, plaintiff has failed to present evidence supporting his claim that he was discriminated against in connection with his religious diet requests because he is Muslim. His "class of one" discrimination claim is similarly deficient.

"Class of one" equal protection claims arise without regard to protected-class status where the plaintiff "has been intentionally treated differently from others similarly situated and . . . there is no rational basis for the difference in treatment." Village of Willowbrook, 528 U.S. at 564. According to the Seventh Circuit, a plaintiff has the burden of proving two elements to establish such a claim. First, he must demonstrate that the government is treating unequally persons who are prima facie identical in all relevant respects. Albiero v. City of Kankakee, 246 F.3d 927, 932 (7th Cir. 2001) (citing Indiana State Teachers Ass'n v. Bd. of Sch. Comm'rs, 101 F.3d 1179, 1181-82 (7th Cir. 1996)). Second, he must show that the sole cause of the differential treatment of which he complains was a totally illegitimate animus toward him by the defendants. Hilton v. City of Wheeling, 209 F.3d 1005, 1008 (7th Cir. 2000). A plaintiff advancing a "class of one" claim must "eliminate any reasonably conceivable state of facts that

---

[19]The exhibit to which plaintiff refers in his affidavit relates to a medical diet request that he made in 2002 and is therefore not relevant to his instant claims, which involve events that occurred in 1997. (Kilaab Aff. ¶ 17, Ex. 4.)

could provide rational basis for the classification." <u>Bell v. Duperrault</u>, 367 F.3d 703, 708 (7th Cir. 2004).

Plaintiff's class of one claim must fail because there is no evidence in the record suggesting that plaintiff was singled out or that an illegitimate animus was behind defendants' decision to deny his dietary requests. All inmates at OSCI or RCI, including all Muslim inmates, were provided with a self-select diet or vegetarian options. Neither of these institutions provided halal meats or any of the other dietary accommodations plaintiff sought to anyone. Moreover, plaintiff offers no evidence to suggest that defendants Smith or Morgan dismissed his complaints based on their irrational desire to discriminate against him. To the contrary, as discussed above, the evidence shows that the decisions to deny his dietary requests were motivated by economic and social order concerns. Consequently, because plaintiff cannot meet his burden of proof on his "class of one" equal protection claim, it too will be dismissed.

### 3. Religious Name Claims

As a result of my rulings on the parties' previous motions for summary judgment, only two name-related claims remain: (1) a Fourteenth Amendment due process claim based on plaintiff's allegations concerning the issuance of conduct reports and the rejection of his administrative grievances because of the use of his "dual name" (Kilaab/Casteel); and (2) a First Amendment freedom of speech claim relating to the use of his "dual name."

### a. Due Process Claim

Plaintiff alleges that his due process rights were violated when defendants rejected his administrative grievances because they were signed with his legal name. More specifically, he asserts that he was found guilty in connection with five conduct reports because he used

27

his "dual name" and that other conduct reports were affirmed because he used his dual name on the appeal forms.

I have already determined that plaintiff did not administratively exhaust any claims related to his conduct reports and the use of his "dual name." (Court Order of Sept. 29, 2006 at 21 n.10.) Plaintiff argues that I should consider these unexhausted claims because he substantially complied with the institution's grievance policy. To support his assertion that he gave defendants notice of his demands, plaintiff relies on a number of paragraphs in his Fifth Affidavit. However, such statements do not create a dispute on this issue because they are not based on plaintiff's personal knowledge and contain hearsay. Furthermore, none of the paragraphs he identifies provides any credible evidence showing that plaintiff attempted to give the institution notice of his particular demands regarding conduct reports issued because he used his dual name or any appeals relating to similar conduct reports. For example, one of the paragraphs relied on by plaintiff states as follows:

> The physical evidence that Tayr Kilaab collected between 1988 thru [sic] 2001 (solar) reveals that the Warden and other prison officials have numerous times consulted with legal counsel or the Attorney general office relate to legal claims prior to this lawsuit being commence. The DOC and defendants had known enough about the law to realize Tayr Kilaab had a clearly established right because legal counsel informed him on more than one occasion.

(Kilaab Fifth Aff. ¶ 26.) Additionally, a document relied on by plaintiff in another paragraph of his affidavit is not pertinent as it is dated April 18, 2005 (Fifth Aff. of Ghashiyah, Ex. 8), which is well after the instant action was filed. The other evidence identified by plaintiff concerns his religious diet and property claims and has nothing to do with his name claims. (Id., ¶¶ 30-33.)

Thus, I find that defendants are entitled to summary judgment with respect to plaintiff's due process claims because plaintiff failed to exhaust any claims relating to his conduct

28

reports.[20]

**b.     First Amendment Freedom of Speech Claim Concerning Use of Religious Name**

In the September 29, 2006 decision, I held that plaintiff had exhausted only three claims concerning the use of his religious name.  I ultimately dismissed two of those three claims advanced against defendant McCaughtry.   (Docket #218 at 34.)   Hence, the only First Amendment religious name claim that remains is plaintiff's contention that defendant Bertrand violated his First Amendment freedom of speech rights when he dismissed an inmate complaint alleging that Sergeant Lardinois had delivered mail to him addressed to "Tayr Kilaab al Ghashiyah" but refused to send plaintiff's outgoing mail that was under the name "Tayr Kilaab/Casteel."[21]  (Id. at 13.)  In other words, plaintiff contends that his First Amendment right to free speech was violated by defendant's refusal to allow him to use his religious name on his outgoing mail.

Regulations involving an inmate's outgoing mail are scrutinized under the standard identified in Procunier v. Martinez, 416 U.S. 396, 413 (1974).  Although Martinez was later overturned in part, the Supreme Court specified in doing so that the decision would remain the standard for cases involving outgoing mail.  See Thornburgh v. Abbott, 490 U.S. 401, 413 (1989).  There are two components to the Martinez test.  "First, the regulation or practice in

---

[20]It is unclear whether plaintiff is advancing a separate claim that his due process rights were violated by defendants' refusal to process his inmate complaints.  To the extent that he is advancing such a claim, it too is without merit in view of my previous ruling that plaintiff did not show that he was prevented from utilizing the inmate complaint process, and plaintiff has not attempted to call that finding into question.  (Docket #218 at 19-20.)

[21]Defendants correctly recognize that I have already dismissed plaintiff's First Amendment Free Exercise Clause and RLUIPA claims based on these allegations.  (Docket #218 at 32.)

question must further an important or substantial governmental interest unrelated to the suppression of expression." Martinez, 416 U.S. at 413. Such interests include "security, order, and rehabilitation." Id. Second, the challenged action "must be no greater than is necessary or essential to the protection" of that interest. Id.

Defendants have provided evidence establishing that in rejecting the outgoing mail, Sergeant Lardonis was following procedures prohibiting inmates from using names other than the one by which they were committed to DOC custody, unless the name was changed on the institution's records. (DPFOF ¶¶ 284 and 285; Wis. Admin. Code § 303.) At the time, plaintiff's judgment of conviction had not been amended to reflect his name change, nor was there a court order changing his legal name on all records. (DPFOF ¶ 284; Pl's Resp. to DPFOF ¶ 284.) In addition, defendants have presented evidence showing that its name restrictions on outgoing mail furthered the interest of maintaining order. During the time period at issue in this case, GBCI housed over 850 inmates, and it would not be feasible to require mail room staff to process mail carrying names other than the name on the Active Offender roster. (DPFOF ¶¶ 286-288.)

Plaintiff has not addressed the arguments made by defendants in support of their motion for summary judgment on his First Amendment free speech claim. He has not made any effort to explain how the regulations relating to outgoing mail violated his First Amendment right to express his religious name. It is undisputed that the challenged piece of mail incorporated only parts of both plaintiff's religious name and his convicted name. That being so, prohibiting plaintiff from sending out mail which, by his own admission, does not even include his full religious name cannot realistically be said to suppress his right to free speech. Moreover, plaintiff has not presented any evidence suggesting that enforcement of the rule regarding

30

outgoing mail was more restrictive than necessary to protect order within the institution.[22] A party's failure to show what evidence he has to convince a trier of fact to accept his version of events will result in summary judgment for the opposing party.  Johnson v. Cambridge Industries, Inc., 325 F.3d 892, 901 (7th Cir. 2003).  As a result, defendants are entitled to summary judgment on plaintiff's religious name claim under the First Amendment's Free Speech Clause.

### 4.  Religious Property Claims

Plaintiff claims that defendants have denied him the use of religious property such as prayer oil, candles, incense, smoking sacrament and talismans in violation of his rights under the First Amendment, the Equal Protection Clause of the Fourteenth Amendment and RLUIPA. He maintains that the use and possession of oil, incense and candles are an important part of his religious practice and beliefs, that prison regulations prohibit inmates from possessing oil, incense and candles, but at the same time permit other inmates to possess similar items, such as baby oil, petroleum jelly, sun-block lotion and scented personal care products purchased from the prison canteen.  Plaintiff also avers that Native Americans are permitted to possess religious items such as sage to burn in their cells and are allowed to smoke sacrament and to possess religious items.

As a result of my previous rulings, plaintiff's religious property claims have been limited in two ways.  First, plaintiff is entitled to recover punitive and nominal damages only relating to this claim because he failed to allege that he suffered physical injury as a result of defendants'

---

[22] Plaintiff's entire argument in response to defendants' motion for summary judgment on this claim consists of his assertion that he was discriminated against with respect to the use of his religious name.  Arguments concerning discrimination are not pertinent when analyzing the merits of a First Amendment free speech claim.

31

actions as required under 42 U.S.C. § 1997e(e).[23]  (See Court Order of Sept. 29, 2006 at 22.) Secondly, plaintiff is not entitled to injunctive relief with respect to his religious property claims. Plaintiff's requests for injunctive relief with respect to his religious property claims under RLUIPA and the First Amendment have been previously dismissed my order of March 28, 2005.  (Docket #160 at 12.)  In that decision, I found that plaintiff's failure to file form 1090 barred him from obtaining injunctive relief.  In so ruling, I concluded that defendants' requirement that plaintiff file form 1090 with respect to his religious property was reasonably related to a legitimate penological interest – namely economic concerns and the need to maintain institutional order.  (Id. at 9.)  This conclusion also precludes plaintiff from seeking injunctive relief relating to his religious property claims under the Equal Protection Clause.  See May, 226 F.3d at 882 (stating that a regulation which treats inmates unequally will nonetheless be upheld if it is reasonable in light of legitimate penological interests).  Moreover, other than making a general argument that the requirement of filing a form 1090 is not valid or enforceable, plaintiff does not challenge defendants' contention that he is not entitled to injunctive relief on his equal protection claim.

Finally, the exhaustion requirement of the PLRA limits plaintiff's religious property claims to the claims that were raised and administratively exhausted prior to January 5, 2001 – the date plaintiff filed his complaint.  It is undisputed that during the relevant time period, plaintiff filed six inmate complaints about religious property.[24]  The record also reveals that of these six,

---

[23]Plaintiff does not take issue with defendants' contention that he is not entitled to compensatory damages.

[24]Initially, defendants insisted that plaintiff had filed only five complaints but in his response brief, plaintiff identified a sixth inmate complaint (RCI-2000-4577).

32

four were properly exhausted: (1) WCI-1990-0600, in which plaintiff complained that his prayer rug was improperly confiscated as contraband (DPFOF ¶¶ 291-297); (2) OSCI-1996-2483, in which plaintiff alleged that OSCI Chaplain Poff was denying him prayer oil in violation of his constitutional rights (DPFOF ¶¶ 304-308); (3) OSCI-1996-2769, in which plaintiff complained that Officer Wagoner had told him that he could not wear his religious medals (DPFOF ¶¶ 311-314); and (4) RCI-2000-4577, in which plaintiff complained about being denied access to religious practices while in segregation such as burning incense or sage, applying oils, burning candles and smoking Shaman. (DPFOF ¶ 339; Pl.'s Resp. Br. at 15).

### a. Religious Property Claims Under RLUIPA

Defendants first argue that they are entitled to summary judgment on plaintiff's religious property claims under RLUIPA because all of plaintiff's four exhausted claims predate RLUIPA's enactment on September 22, 2000, and that the statute should not be applied retroactively.

> When a case implicates a federal statute enacted after the events in suit, the court's first task is to determine whether Congress has expressly prescribed the statute's proper reach. If Congress has done so, of course, there is no need to resort to judicial default rules. When, however, the statute contains no such express command, the court must determine whether the new statute would have retroactive effect, i.e., whether it would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed. If the statute would operate retroactively, our traditional presumption teaches that it does not govern absent clear congressional intent favoring such a result.

Landgraf v. USI Film Products, 511 U.S. 244, 280 (1994).

RLUIPA itself is silent as to its retroactive applicability. See 42 U.S.C. § 2000cc-1(a) et seq.; Mayweathers v. Terhune, 328 F. Supp. 2d 1086, 1098 (E.D. Cal. 2004). Applying the standards set forth by the Supreme Court, it is clear that applying the statute retroactively to

33

award monetary damages for acts predating enactment of the statute would attach new legal consequences with respect to past conduct.  See Cathedral Church of the Intercessor v. Inc. Vill. of Malverne, 353 F. Supp. 2d 375, 389  (E.D.N.Y. 2005) (stating that "RLUIPA may not be applied retroactively for monetary damages for pre-RLUIPA claims but may be applied retroactively for injunctive relief since such relief is considered prospective regardless of when the actions occurred") (citing Prater v. City of Burnside, 289 F.3d 417, 433 (6th Cir. 2002); Kikumura v. Hurley, 242 F.3d 950, 961 n. 5 (10th Cir. 2001)); Mayweathers, 328 F. Supp. 2d at 1098; Orafan v. Goord, No. 00-CV-2022, 2003 WL 21972735, at*8 (N.D.N.Y. 2003); Alexander v. Roberts, No. 00-1007, 2003 U.S. Dist. LEXIS 3782, at *36-37 (E.D. La. Jan. 29, 2003).   Such a result would violate long-standing judicial default rules.

It is undisputed that three of the four exhausted property claims involve conduct that occurred between 1990 and 1996, well before RLUIPA was adopted by Congress on September 22, 2000.[25]   With respect to the fourth exhausted claim identified in inmate complaint RCI-2000-4577, the record reveals that the conduct at issue occurred prior to February 6, 2000, which is when the inmate complaint was filed.  Plaintiff argues that this inmate complaint falls under RLUIPA because the conduct at issue therein "continued up to the date of filing of the complaint" on January 5, 2001.  (Pl.'s Resp. Br. at 15.)  The record belies his assertion, however, because the inmate complaint involves conduct that occurred during his stay at RCI and plaintiff was transferred from RCI to GBCI on March 10, 2000.

Therefore, because judicial default rules dictate that RLUIPA should not be applied

---

[25] These three claims (identified in inmate complaints WCI-1990-06000, OSCI-1996-2483 and OSCI-1996-2769) are also time barred, as I have already determined that a four-year statute of limitations applies to RLUIPA claims and plaintiff filed his complaint on January 5, 2001.

retroactively, defendants are entitled to summary judgment on plaintiff's religious property claims under that statute.

> ### b. First and Fourteenth Amendment Religious Property Claims Involving Inmate Complaints WCI-1990-0600 and OSCI 1996-2769

Defendants next argue that the First and Fourteenth Amendment religious property claims raised in inmate complaints WCI-1990-0600 and OSCI 1996-2769 should be dismissed because plaintiff has failed to establish that any named defendant was personally involved in the deprivations alleged therein. An individual will be held liable in an action under 42 U.S.C. § 1983 only if he or she caused or participated in the constitutional violation of which the plaintiff complains. Wolf-Lillie v. Sonquist, 699 F.2d 864, 869 (7th Cir. 1983). The doctrine of respondeat superior (supervisory liability) does not apply to § 1983 actions. See Monell v. Dep't of Social Serv's, 436 U.S. 658, 694 (1978); Sanville v. McCaughtry, 266 F.3d 724, 740 (7th Cir. 2001); Antonelli v. Sheahan, 81 F.3d 1422, 1428 (7th Cir. 1996). Supervisors who are simply negligent in failing to detect and prevent subordinate misconduct are not personally involved. Rather, supervisors must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see. They must in other words act either knowingly or with deliberate, reckless indifference. Gossmeyer v. McDonald, 128 F.3d 481, 495 (7th Cir. 1997).

In inmate complaint WCI-1990-0600, plaintiff complained that his prayer rug was confiscated by a correctional officer after that officer learned that the rug was another inmate's hobby project, which plaintiff had purchased for $15. The rug was seized as contraband in accordance with WCI Hobby Rules & Procedures, which allows inmates to purchase hobby

35

projects but does not allow the item purchased to become part of an inmate's personal property. In other words, the inmate must make arrangements to have the purchased hobby item sent outside the institution.

Plaintiff did not name the officer who seized the prayer rug as a defendant in this case. The only defendant arguably connected to this event is Warden McCaughtry who approved the ICI's decision to affirm plaintiff's inmate complaint and allow plaintiff to retain the rug or to be reimbursed $15 for it. There is no evidence in the record suggesting that defendant McCaughtry was involved in the confiscation of the rug itself or that the confiscation occurred at his direction or with his knowledge and consent. No evidence has been presented suggesting that defendant McCaughtry created the hobby rules pursuant to which the prayer rug was confiscated or that he knew that the rules were being used by officers to deprive plaintiff (or any other inmate) of his constitutional rights. Indeed, with respect to the issue of personal liability, plaintiff states only that "each named defendant here had overall management responsibility for prison facility confining incarcerated persons" and that "defendants have a hand in drafting a policy or making comment on most policies enacted or enforced." (Pl.'s Resp. Br. at 21.) However, as stated above, there is no respondeat superior liability under § 1983. Thus, defendant McCaughtry cannot be held responsible for this alleged constitutional deprivation.

With respect to inmate complaint OSCI-1996-2769, plaintiff complained that Officer Wagoner asked plaintiff about his religious medals even though he should have known that such medals were permitted. Plaintiff's medal was not taken from him nor did Officer Wagoner prevent plaintiff from wearing his medal in the future. In fact, the ICE report notes that Officer Wagoner was advised that such medals were permitted.

36

Officer Wagoner is not named as a defendant in this action. The only named OSCI defendant is Warden Smith, and the record shows that her involvement with this claim was limited to affirming the dismissal of the complaint. Since the facts show that plaintiff was not prevented from wearing or possessing his religious medal, no constitutional deprivation has even been shown to have occurred. In any event, plaintiff has not provided evidence showing that defendant Warden Smith was personally involved in any constitutional violation.

For all of these reasons, defendants are entitled to summary judgment on the religious property claims raised in inmate complaints WCI-1990-0600 and OSCI 1996-2769.

### c. First and Fourteenth Amendment Religious Property Claims Involving Inmate Complaint OSCI 1996-2483

In OSCI-1996-2483, plaintiff took issue with the fact that the OSCI Chaplain would not give him prayer oil or let him have his own prayer oil. Warden Smith dismissed OSCI-1996-2483 based on the policy set forth in DOC 309 IMP 6-G, which, at the relevant time period, provided that Muslim inmates may possess a Qu'ran, prayer beads, prayer rug and head covering, in addition to other literature, but did not allow personal possession of oils. Plaintiff appears to allege that the decision to deprive him of his right to possess prayer oil violates his rights under both the First Amendment's Free Exercise Clause and the Fourteenth Amendment's Equal Protection Clause.

Defendants argue that they are entitled to summary judgment on this claim because the challenged restrictions on religious property are rationally related to legitimate penological interests.[26] In the prison context, the free exercise and equal protection analyses turn on the

---

[26] Defendants also argue that plaintiff's First Amendment free exercise claim concerning prayer oil is without merit because prayer oil is not required by Islam. I need not address this contention because even if the regulation at issue infringed on plaintiff's First Amendment

37

same question of reasonableness. The Free Exercise Clause protects a prisoner's right to practice his religion as long as doing so does not unduly burden the institution. Richards v. White, 957 F.2d 471, 474 (7th Cir. 1992). A prison regulation that infringes upon an inmate's free exercise rights may be valid "'if it is reasonably related to legitimate penological interests.'" Alston v. DeBruyn, 13 F.3d 1036, 1039 (7th Cir. 1994) (quoting Turner, 482 U.S. at 89); see also Al-Alamin, 926 F.2d at 685 (stating that the DOC "need only make reasonable efforts to afford inmates an opportunity to practice their faith"). Likewise, the Equal Protection Clause requires inmates to be treated equally; however, a prison regulation that treats inmates unequally will be upheld if it is reasonable in light of legitimate penological interests. May, 226 F.3d at 882. "[L]imitations on the exercise of constitutional rights arise both from the fact of incarceration and from valid penological objectives - including deterrence of crime, rehabilitation of prisoners, and institutional security." O'Lone v. Estate of Shabazz, 482 U.S. 342, 348 (1987).

In determining whether a rule is reasonable in light of penological objectives, courts consider:

> 1. whether a valid, rational connection exists between the regulation and a legitimate government interest behind the rule;
> 2. whether there are alternative means of exercising the right in question that remain available to prisoners;
> 3. the impact accommodation of the asserted constitutional right would have on guards and other inmates and on the allocation of prison resources; and
> 4. although the regulation need not satisfy a least restrictive alternative test, the existence of obvious, easy alternatives may be evidence that the regulation is not reasonable.

Al-Alamin, 926 F.2d at 685 (internal quotation marks omitted).

---

rights it was rationally related to a legitimate penological interest.

38

Defendants have articulated legitimate interests behind the policy regarding personal property: limiting scarce prison resources, enhancing prison security and inmate safety, and preventing misuse of property. A regulation like the one at OSCI furthers these interests because its aim is to reduce administrative costs, streamline the process of searching cells and the process of monitoring inmate property. See Charles v. Verhagen, 220 F. Supp. 2d 937, 953 (W.D. Wis. 2002), aff'd, 348 F.3d 601 (7th Cir. 2003). Plaintiff had access to prayer oil for religious services under the institution's policy of having the OSCI Chaplain provide it to inmates prior to prayer services. Defendants have offered testimony that accommodation of plaintiff's requests for property not permitted under the institution's religious property regulation would negatively impact the allocation of prison resources.

Plaintiff has not countered defendants' argument regarding the reasonableness of the regulation at issue nor has he made any effort to show that there were easy alternatives to the religious property regulation that accommodated the interests at stake. See Johnson, 325 F.3d at 901. Accordingly, defendants are entitled to summary judgment on these claims.

### d. First and Fourteenth Amendment Religious Property Claims Involving Inmate Complaint RCI 2000-4577

The last exhausted religious property claim concerns inmate complaint RCI-2000-4577, in which plaintiff complained that he was not able to burn incense, have oils, burn candles or smoke sacrament, such as Shaman smoke, while in segregation.[27] Defendants maintain that

---

[27] Defendants initially propound that plaintiff only exhausted his claim relating to smoking sacrament while in segregation because his appeal stated that "there is no reasons incarcerated persons could not participate in pipe ceremony or other religious activities thru the food port." (DPFOF ¶ 343.) However, this narrow reading of plaintiff's appeal ignores his reference to "other religious activities."

39

they are entitled to summary judgment on these religious property claims under both the First and Fourteenth Amendments because plaintiff has not shown that the requested religious property was central to Islam, he cannot show discrimination because the rules were uniformly applied to all segregation inmates, and the relevant restrictions at RCI were rationally related to legitimate penological interests. I need address only the last argument.

As stated previously, in the prison context, the free exercise and equal protection analyses turn on the same question of reasonableness. In making this determination, I utilize the standards set forth in the preceding section of this decision.

With respect to plaintiff's requests that he be allowed to possess talismans while in segregation, I have already found that the regulation limiting the religious property of Muslims in the general population to a Qu'ran, prayer beads, prayer rug and head covering (DOC 309 IMP 6-G) was reasonably related to legitimate penological interests: security, inmate safety and allocation of prison resources. Therefore, it goes without saying that imposing these same or similar limitations on inmates in segregation would also be reasonably related to legitimate penological interests.

During the relevant time period, Muslims in segregation at RCI were allowed to possess religious books, a prayer rug and a kufi-cap, but they were not allowed to have talismans. I find that the heightened security concerns that exist in the segregation unit are furthered by restrictions on talismans, which can be used as weapons or to hide contraband. (DPFOF ¶ 363.)

Further, inmates in segregation and in the general prison population are not allowed to smoke "Shaman smoke" or burn incense or candles. Smoking has not been allowed at RCI

since May 1996. (DPFOF ¶ 356.) Defendants present evidence that allowing inmates in segregation to smoke in their cells or to burn incense or candles poses security risks, fire hazards and health issues. (DPFOF ¶¶ 339 and 365-367.) Permitting inmates to smoke and anoint their bodies with oil may mask the odors of unlawful activities such as smoking marijuana and may impede the ability of guards to quickly, safely and securely extract inmates against their will from their cells. (DPFOF ¶¶ 367-369.)

While in segregation, plaintiff had other ways to practice his religion such as receiving spiritual counseling at his cell door if he asked to see the chaplain. Plaintiff suggests that his requests for smoking sacrament could have been accommodated by having an officer pass him a pipe (or candle or incense) through the food tray slot and retrieve it when he is finished. This proposal would unduly burden prison resources (such as the availability of guards) and does not alleviate the concerns that underlie the prohibition against incendiary materials in the entire institution.

In sum, the restrictions placed on plaintiff's religious property while in segregation were reasonably related to legitimate penological interests, specifically, security, and inmate health and safety. As a result, defendants are entitled to summary judgment on the claims set forth in inmate complaint RCI-2000-4557.

## C.    Conclusion

For the reasons set forth above, defendants are entitled to summary judgment on all of plaintiff's remaining claims. Hence, plaintiff's motion for summary judgment will be denied as moot.

41

## IV.  MOTIONS FOR RULE 11 SANCTIONS

Both parties seek sanctions under Fed. R. Civ. P. 11.   Under that Rule, an attorney or pro se litigant who signs any paper filed with the court warrants that the paper is not presented for an improper purpose, is supported by existing law or a non-frivolous argument for a change in the law, and that any factual assertions contained in the paper have evidentiary support. Fed. R. Civ. P. 11(b).  Violation of any of these requirements may result in monetary or non-monetary sanctions.

Rule 11 applies to pro se litigants as well as lawyers.  While the court may take a party's status as a pro se litigant into account, sanctions can be imposed for any suit which is frivolous. Vukadinovich v. McCarthy, 901 F.2d 1439, 1445 (7th Cir. 1990).  However, the recapture or shifting of legal expenses is not the purpose of Rule 11 since its "central goal" is deterrence. See Cooter & Gell v. Hartmarx Corp., 496 U.S. 384, 393 (1990).

Party-initiated sanctions under Rule 11 depend on the filing of a motion under Rule 11(c)(1)(A).  This motion must be served on the non-movant, but it may not be filed with the court until the opposing party has had twenty-one days to decide whether to withdraw the supposedly offending pleading.  Fed. R. Civ. P. 11(c)(1)(A).  Only if the non-movant maintains its position may the movant inform the court and request sanctions.  See Nisembaum v. Milwaukee County, 333 F.3d 804, 808 (7th Cir. 2003).  A motion for sanctions under Rule 11 is addressed to the sound judgment of the district court.  Id. at 810-811.

## A.    Defendants' Motion for Sanctions

Defendants seek sanctions stemming from plaintiff's filing of a Motion to Strike on

42

October 16, 2006. Plaintiff's motion asked the court to strike "the defendants' previous [sic] filed summary judgment motions and other filings" on the ground that "Counsel do not have any legal standing to defend these defendants." He maintained that counsel was required to file a "'Foreign Agents Registration Statement' pursuant to 22 USC § 611(c)(1)(iv) and 612." I denied plaintiff's motion by order of November 15, 2006 (Docket #226) on the ground that the statutes cited by plaintiff governed situations in which a person acts as an agent of a foreign principal and thus were inapplicable to the case at hand.

In their motion, defendants maintain that sanctions are warranted because there was no factual or legal basis for plaintiff's motion to strike and the motion lacked a legitimate purpose. In addition, defendants assert that plaintiff did not withdraw his motion despite being notified of the opportunity to do so in accordance with Rule 11(c)(1)(A). As a result, defendants seek monetary compensation of $100 to $147 for attorneys' fees incurred in defending plaintiff's motion and a court order "putting plaintiff on notice that future frivolous or intemperate filings will result in dismissal of his case." (Defs.' Mot. for Rule 11 Sanctions at 4.)

Plaintiff's motion to strike was legally and factually without merit. Nevertheless, because all of plaintiff's claims will be dismissed as stated herein, defendants' request for a court directive that plaintiff's case will be dismissed if he submits any future frivolous filings is moot. With respect to defendants' request for monetary compensation, plaintiff is indigent and incarcerated, and I am not convinced that any monetary penalty would do anything to deter him from making future frivolous filings. Indeed, any monetary penalty imposed on plaintiff probably could not be collected. Consequently, I decline to impose any sanction on plaintiff. See Corley v. Rosewood Care Center, Inc. of Peoria, 388 F.3d 990, 1013 (7th Cir. 2004) (stating

43

that district courts have discretion in determining whether Rule 11 sanctions are appropriate).

**B.    Plaintiff's Motion for Sanctions**

Plaintiff's own request for sanctions is based on his assertion that counsel for defendants entered the perjured testimony of Pamela Fuller and Linda Alsom-O'Donovan.[28] Plaintiff's motion will be denied because he has not shown that he has complied with the requirement under Rule 11(c)(1)(A) that he give the opposing party formal notice of the conduct alleged to violate Rule 11 and the opportunity to withdraw or correct its actions to avoid imposition of sanctions.  In addition, denial of plaintiff's motion is warranted because he has not identified the nature of the perjured testimony nor has he provided any evidence from which I could conclude that Fuller or Alsom-Donovan knowingly gave false testimony.

## V.  PLAINTIFF'S MOTION FOR COSTS

Plaintiff has also filed a motion seeking an award of costs in the amount of $2,824.80 and attorney's fees of $1,237.97 pursuant to Fed. R. Civ. P. 54.  Awards of costs are governed by Rule 54(d)(1), which provides that "costs other than attorneys' fees shall be allowed as a matter of course to the prevailing party unless the court otherwise directs."  With respect to attorneys' fees, Rule 54(d)(2)(B) states: "Unless otherwise provided by statute or order of the court, the motion [seeking attorneys' fees] must be filed no later than 14 days after entry of judgment . . . . "  Plaintiff is not the prevailing party in this case and judgment has not yet been entered.  Therefore, plaintiff's motion for costs and fees will be denied.

---

[28]Plaintiff did not specify the rule pursuant to which he brings his motion so I will construe his motion for sanctions as one under Rule 11(c).

44

## VI. CONCLUSION

**For the foregoing reasons,**

**IT IS THEREFORE ORDERED** that defendants' Third Motion for Summary Judgment (Docket #242) is **GRANTED**.

**IT IS FURTHER ORDERED** that this action be and is hereby **DISMISSED**.

**IT IS FURTHER ORDERED** that plaintiff's Motion for Summary Judgment (Docket #237) is **DENIED**.

**IT IS FURTHER ORDERED** that defendants' Motion for Rule 11 Sanctions (Docket #223) is **DENIED**.

**IT IS FURTHER ORDERED** that plaintiff's Motion for Sanctions (Docket #260) is **DENIED**.

**IT IS FURTHER ORDERED** that plaintiff's Motion for Costs Under Rule 54 (Docket # 252) is **DENIED**.

The Clerk of Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 27 day of September, 2007.

/s_____
LYNN ADELMAN
District Judge